AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No. 3:23-mj-00423
)
Subject Devices 1, 2, 3, 4, and 5, currently located )
at the Montgomery County Sheriff's Office, )
345 W. Second Street, Dayton, Ohio 45422 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| SEE ATTACHMENT C | |

The application is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Frederick D. Zollers, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date: 10/11/23

City and state: Dayton, Ohio

Peter B. Silvain, Jr.
**United States Magistrate Judge**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
**SUBJECT DEVICES 1, 2, 3, 4, and 5,**
CURRENTLY LOCATED AT THE
MONTGOMERY COUNTY SHERIFF'S
OFFICE, 345 W. Second Street, Dayton, Ohio
45422

Case No.　3:23-mj-00423

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, **Frederick D. Zollers**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.　　I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—the listed electronic devices—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.　　I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I am therefore an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510. I've been a sworn law enforcement officer in the State of Ohio for seventeen years. I am presently a sworn member of the Montgomery County Sheriff's Office ("MCSO"). I am currently assigned to the FBI Southern Ohio Safe Streets Task Force ("SOSSTF") as a TFO.

3.     I have been involved in narcotics-related arrests; the execution of search warrants which resulted in the seizure of narcotics; and supervised the activities of informants who provided information and assistance resulting in drug buys.  Since 2014, I received training and experience in interviewing and interrogation techniques; arrest, search and seizure procedures; narcotics investigations; and various other criminal investigations resulting in successful prosecution.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.  In the course of conducting narcotics investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized wire and oral interception electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.  I have repeatedly encountered the practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone."  The money phone is used primarily to communicate with those customers.  The customers will subsequently call or send a text message to the trafficker on that cellular telephone number to arrange a purchase of drugs as needed.  Based on training and experience, I know drug traffickers often possess and use multiple cellular phones.  Through my training, I have become familiar with coded terminology utilized by drug trafficking organizations to disguise their illegal activities and the way they conduct these illegal activities.

2

4.      Along with other agents, task force officers, and law enforcement officials, I am currently involved in the investigation of drug trafficking and firearms offenses committed by Kevin BYRD – including violations of: 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a telephone communication facility to facilitate a drug trafficking crime); 21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances); 21 U.S.C. § 856 (maintaining a drug premises); 18 U.S.C. § 924(c) (use and carrying of a firearm during and in relation to a drug trafficking crime); and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) (hereinafter and collectively "Subject Offenses"). I have personally participated in this investigation and have spoken to, as well as received information from, other agents and investigators participating in this matter. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge. This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched are five electronic devices, hereinafter listed as **DEVICE-1, DEVICE-2, DEVICE-3, DEVICE 4**, and **DEVICE-5**. The Devices are currently located at the Montgomery County Sheriff's Office, 345 W. Second Street, Dayton, Ohio and further described as follows:

   a. **DEVICE-1:** Gold Apple iPhone 13 Pro Max, Model A2484, IMEI: 352569488297944.

b. **DEVICE-2**: white Apple iPhone 11, Model A2111, IMEI: 351461186577531.

c. **DEVICE**-3: black Verizon Kyocera flip cellular phone, IMEI: 990006153341960.

d. **DEVICE**-4: black Verizon Kyocera flip cellular phone, IMEI: 990006160487673.

e. **DEVICE**-5: black Verizon Kyocera flip cellular phone, IMEI: 990006138577233.

(collectively, the "Subject Devices"). The Subject Devices are described in Attachment A, which is incorporated by reference.

6.     I believe that there is probable cause to believe that evidence of the Subject Offenses will be found on the Subject Devices. The applied-for warrant would authorize the forensic examination of the Subject Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.     On September 14, 2023, members of the Regional Agencies Narcotics and Gun Enforcement Task Force ("RANGETF") and members of the FBI Southern Ohio Safe Streets Task Force ("SOSSTF") conducted an operation involving a buy-bust and execution of a search warrant at 829 Southview Drive. The buy-bust and search warrant operation was the result of a drug trafficking investigation involving undercover drug purchases of methamphetamine from David Minor (hereinafter "Minor"). On Tuesday, September 12, 2023, Task Force Officer

(TFO) Andrew McCoy obtained a state search warrant for Minor's person, the 2014 Chevrolet Impala, and the residence of 829 Southview Drive on September 12, 2023. The search warrant was authorized by the Honorable Montgomery County Common Pleas Court Judge Gerald Parker.

8.      Following a detailed briefing, task force members and aerial surveillance established surveillance in the area of 829 Southview Drive. At approximately 12:43 p.m., surveillance members observed a black Chevrolet Impala back into the garage of 829 Southview Drive. At approximately 12:59 p.m., surveillance members observed the same black Chevrolet Impala exit the garage and depart from 829 Southview Drive. Task force members obtained the license plate on the Chevrolet Impala, verifying it was the Chevrolet Impala that Minor was known to drive and had driven to prior drug deals.

9.      While surveillance was actively being conducted on the Chevrolet Impala, I acted in an undercover capacity and placed a controlled call to cellular phone number (937) 684-5776 (approximately 1:04 p.m.). I spoke with a male who I recognized from prior conversations to be Minor. I arranged to purchase a "whole" (street term for one pound of methamphetamine). Minor directed me to call back when close.

10.     Aerial surveillance surveilled the Chevrolet Impala to the area of Seybold Road and Snake Road, where they observed the driver of the Chevrolet Impala engage in a suspected car-to-car drug transaction with another vehicle. Both vehicles then departed the area and aerial surveillance continued to surveil the Chevrolet Impala. The Chevrolet Impala drove to the area of 724 Webster Street, Dayton, Ohio and parked. Aerial surveillance observed the single occupant black male driver exit the Chevrolet Impala and walk toward 724 Webster Street. Task force members drove to the area of 724 Webster Street and observed Minor exiting a grey in

5

color northwest side door with a number "2" on it. TFO Dustin Phillips observed that Minor had a large bulge, consistent with the size of one pound, concealed in his left front shorts pocket. Additionally, TFO Phillps observed a grey plastic baggie partially sticking out of Minor's left front shorts pocket. TFO Phillips observed another black male, later identified as Kevin Byrd (hereinafter "BYRD"), look out from the door that Minor exited. BYRD looked up and down the street and then shut the door remaining inside the building.

11.    Aerial surveillance continued to surveil Minor as he re-entered the Chevrolet Impala and departed the area. After Minor departed, task force members maintained surveillance at 724 Webster Street. As surveillance was being maintained on Minor, I spoke with Minor via cell phone number (937) 684-5776 and he ultimately directed me to drive to the area of Seybold Road and Westbrook Road, where the prior controlled buys had occurred. At approximately 2:05 p.m., I met with Minor on Seybold Road south of Westbrook Road. I provided Minor with the documented buy-funds in exchange for a large quantity of suspected methamphetamine. After conducting the drug deal, Minor departed the area. Aerial surveillance continued to surveil Minor. Task force members coordinated with a marked cruiser and attempted to initiate a traffic stop on Minor at approximately 2:11 p.m. Minor fled from the traffic stop in the Chevrolet Impala. Aerial surveillance continued to surveil Minor as he fled in the Chevrolet Impala. Ultimately, Minor drove to the area of Fountain Avenue where he bailed from the Chevrolet Impala and attempted to flee on foot. Minor was apprehended behind 59 Fountain Avenue.

12.    During the time Minor was fleeing in the Chevrolet Impala, TFO Phillips observed BYRD exit the same door that Minor exited at 724 Webster Street, while holding a clear plastic baggie of what TFO Phillips suspected to be methamphetamine. TFO Phillips observed BYRD engage in a hand-to-hand drug transaction with an occupant of a dark colored

sedan. After engaging in the hand-to-hand drug transaction, TFO Phillips observed BYRD re-enter 724 Webster Street door number "2" while holding U.S. currency.

13.     At approximately 2:53 p.m. task force members observed BYRD exit 724 Webster Street door number "2." BYRD locked the door with a key and then departed driving a grey Nissan Rogue. Task force members followed BYRD and attempted to initiate a traffic stop on the Nissan Rogue. BYRD fled from task force members in the Nissan Rogue. Soon after BYRD fled in the Nissan Rogue, task force members discovered he crashed the vehicle in the area of Cornell Avenue and Philadelphia Drive, striking two vehicles. One of the occupants of a vehicle was transported to the hospital. Task force members apprehended BYRD. Task force members located a loaded SAR ARMS 9mm handgun with serial number T110213E09757 on the driver's side floorboard of the Nissan Rogue. Additionally, task force members located several sets of keys on the driver's side floorboard of the Nissan Rogue.

14.     Task force members continued surveillance at 724 Webster Street. Task force members spoke with the property owner of 724 Webster Street. The property owner advised that they rent six separate units out of the building address 724 Webster Street. The property owner advised a male named Deshawn Byrd rented Suite Number 2, which is the door task force members observed Minor and BYRD entering and exiting.

15.     TFO McCoy drafted and obtained a state search warrant for 724 Webster Street, Suite Number 2. The search warrant was authorized by the Honorable Montgomery County Common Pleas Court Judge Mary Wiseman on September 14, 2023, at approximately 5:29 p.m.

16.     Pursuant to the search warrant, task force members searched 724 Webster Street, Suite Number 2. Task force members utilized one of the keys located on the driver's side floorboard of the Nissan Rogue to unlock the front door to 724 Webster Street, Suite Number 2.

7

Task force members located the following but not limited to items inside of 724 Webster Street, Suite Number 2; a large quantity of suspected controlled substances which were later confirmed by a laboratory to be the following:

- 6.48 grams of Methamphetamine
- 431 grams of Methamphetamine
- 60.13 grams of Fentanyl (544 blue pills marked M 30)*
- 15.28 grams of Fentanyl (138 blue pills marked M 30)*
- 231.1 grams of Methamphetamine
- 606 grams of Fentanyl
- 935.2 grams of Fentanyl
- 4,997.2 grams of Methamphetamine
- 194.55 grams of Fentanyl
- 22.36 grams of Fentanyl

*These are counterfeit Oxycodone pills.

17.     Law enforcement also seized a loaded Smith & Wesson 9mm handgun with serial number FZY1410, and a large amount of U.S. currency. It should be noted that the above-described items were located within locked rooms inside of 724 Webster Street, specifically a conference room and storage room. Keys to the front door of 724 Webster Street, the conference room, and the storage room were found on the sets of keys that task force members located on the driver's side floorboard of the Nissan Rogue. Based on training and experience, I know that drug traffickers utilize firearms to protect their drugs and drug proceeds.

18.     Task force members located the above-described **Subject Devices (1-5)** while conducting a search of BYRD's person and the Nissan Rogue incident to his arrest. Two of the

8

Verizon Kyocera flip cell phones were located on BYRD's person. An additional Verizon Kyocera flip cell phone and two Apple iPhones were located inside of the Nissan Rouge. Investigators later listened to recorded jail calls that BYRD placed while incarcerated at the Montgomery County Jail. BYRD's first call was placed to phone number (937) 581-2024 to a female identified as Jasmin Carr through the PAYTEL recording system. In summary, BYRD told the female about the events leading up to his arrest. BYRD described running from police and having the handgun. BYRD told the female that the police got the phones. The female asked what phones and BYRD said the "money phones." Based on training and experience, I know that the term "money phone" refers to a cell phone utilized by drug traffickers to communicate and conduct drug transactions.

19. On September 15, 2023, BYRD was arrested on various drug trafficking and firearms charges related to the incident on September 14, 2023. *See* Southern District of Ohio Case No. 3:23-mj-382. On September 26, 2023, a Grand Jury charged BYRD by Indictment with various drug trafficking and firearms offenses related to the incident on September 14, 2023. *See* Southern District of Ohio Case No. 3:23-cr-90.

20. Based on training and experience, I know that drug traffickers frequently use cellular phones to carry out their activities. They use cellular phones to communicate with customers, their associates, and their suppliers. It is often common for drug traffickers to have multiple phones because certain phones may be used only for certain purposes. For instance, a trafficker may use one phone just to speak to his supplier, while using a different phone to speak only to his customers. This is a counter-surveillance technique intended to make it harder for law enforcement to identify the user of the phones and his associates. Traffickers commonly use prepaid cellular phones to hide their identity as the user because they generate no billing

9

information, often require little to no identifying information to activate, can sometimes be activated using an alias, and can be easily disposed of should the trafficker believe that law enforcement has identified the phone number.

21.     I also know that traffickers commonly text message each other or their customers, such as meeting locations, prices, and other information needed to carry out the sale of drugs (sometimes in code). They commonly store phone numbers for their associates and customers in the electronic phone book/contacts list, often under alias or code names. I know that traffickers will sometimes use the cellular phone to take photographs or videos of themselves, their location, their product, or their associates, which can be electronically stored on the cellular phone. Information can also be downloaded from the internet onto the cellular phone, such as email, social network information (like "Facebook"), travel information like maps or directions, or photographs. Call data, such as missed calls, received calls, or dialed calls are often electronically stored in the cellular phone. The information electronically stored on a phone can also be evidence of who possessed or used a cellular phone at a given time, can contain direct evidence of drug trafficking acts, and can help identify drug trafficking locations or associates. I am aware that there are tools to extract electronic data from a cellular phone so that law enforcement can review it for items of evidentiary value.

22.     I believe concealed within the Subject Devices seized from BYRD's person and the Nissan Rouge are the numbers associated with that cellular phone, names, text messages, voice mail messages, photographs/videos, contact numbers, addresses, related stored information, call logs, and any deleted information for individuals involved in the purchase, transportation, and/or distribution of illegal narcotics. Specifically, I believe the Subject Devices will contain names and phone numbers of co-conspirators (both drug suppliers and drug

10

customers) in the contact list, calls to other co-conspirators in the call log and text messages to those same co-conspirators that can be used as evidence of possession with the intent to distribute and to distribute controlled substances and conspiracy to do the same (21 U.S.C. § 841(a)(1) and 846) and use of a communication device to facilitate a crime (21 U.S.C. § 843(b).

23.    I believe the Subject Devices will contain the information listed above based upon law enforcement's surveillance of MINOR and BYRD. Further, based upon my prior training and experience in narcotics investigations, it is my considered opinion that individuals who engage in drug trafficking commonly utilize cellular telephones to generate and receive voice messages, text messages, WhatsApp messages by and between associates, colleagues, and co-conspirators and also to track and sell drug shipments. Those engaging in drug trafficking commonly use cellular telephones to notify/alert co-conspirators of the arrival of a shipment, to arrange for its pick-up and to deposit money.

24.    The Subject Devices are currently in the lawful possession of the Montgomery County Sheriff's Office, 345 W. Second Street, Dayton, Ohio. In my training and experience, I know that the Subject Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of the Montgomery County Sheriff's Office.

**TECHNICAL TERMS**

25.    Based on my training and experience, I use the following technical terms to convey the following meanings:

11

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.

12

This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

13

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

14

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Subject Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience,

15

examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

28.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

> a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

> b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

16

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

31.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Frederick D. Zollers
Task Force Officer
Federal Bureau of Investigations

Subscribed and sworn to before me
on October 11, 2023,

Peter B. Silvain, Jr.
United States Magistrate Judge

18

## ATTACHMENT A

The property to be searched includes:

      a.  **DEVICE-1:** Gold Apple iPhone 13 Pro Max, Model A2484, IMEI: 352569488297944.

      b.  **DEVICE-2**: white Apple iPhone 11, Model A2111, IMEI: 351461186577531.

      c.  **DEVICE**-3: black Verizon Kyocera flip cellular phone, IMEI: 990006153341960.

      d.  **DEVICE-4**: black Verizon Kyocera flip cellular phone, IMEI: 990006160487673.

      e.  **DEVICE-5**: black Verizon Kyocera flip cellular phone, IMEI: 990006138577233.

      The Devices are currently located at the Montgomery County Sheriff's Office, 345 W. Second Street, Dayton, Ohio.

This warrant authorizes the forensic examination of the Subject Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.       All records on the Subject Devices described in Attachment A that relate to

violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances);

21 U.S.C. § 843(b) (use of a telephone communication facility to facilitate a drug trafficking

crime); 21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances);

21 U.S.C. § 856 (maintaining a drug premises); 18 U.S.C. § 924(c) (use and carrying of a firearm

during and in relation to a drug trafficking crime); and 18 U.S.C. § 922(g)(1) (felon in possession

of a firearm) (hereinafter and collectively "Subject Offenses") and involve Kevin BYRD:

   a.   lists of customers and related identifying information;

   b.   types, amounts, and prices of drugs trafficked as well as dates, places, and
        amounts of specific transactions;

   c.   any information related to sources of drugs (including names, addresses, phone
        numbers, or any other identifying information);

   d.   any information recording BYRD's schedule or travel;

   e.   all bank records, checks, credit card bills, account information, and other financial
        records.

2.       Evidence of user attribution showing who used or owned the Device at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history;

This warrant authorizes a review of electronic storage media and electronically stored

information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or

copied electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.

**ATTACHMENT C**

21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances)

21 U.S.C. § 843(b) (use of a telephone communication facility to facilitate a drug trafficking crime)

21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances)

21 U.S.C. § 856 (maintaining a drug premises)

18 U.S.C. § 924(c) (use and carrying of a firearm during and in relation to a drug trafficking crime)

18 U.S.C. § 922(g)(1) (felon in possession of a firearm)